Avidan Y. Cover (0087534)
Emily Grannis (Pending permission to participate under Local R. 83.6)
Jenna Leventoff (Pending permission to participate under Local R. 83.6)
CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW
MILTON A. KRAMER LAW CLINIC CENTER
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-2766
*Attorney and Legal Interns for Plaintiff*

| | |
|---|---|
| MYRON MADDOX, | UNITED STATES DISTRICT COURT DISTRICT OF NORTHERN OHIO |
| Plaintiff, | |
| v. | DOCKET No. |
| CITY OF SHAKER HEIGHTS and OFFICER WILLIAM MARTIN # 26 (sued in his individual capacity). | **CIVIL ACTION** |
| Defendants. | **COMPLAINT** |

Plaintiff Myron Maddox ("Mr. Maddox"), through his undersigned attorneys, states his Complaint against the Defendants City of Shaker Heights (the "City") and Police Officer William Martin ("Officer Martin") as follows:

## PRELIMINARY STATEMENT

1. This is a case about police using excessive force on an unarmed, nonviolent suspect. During Officer Martin's attempt to arrest Mr. Maddox, the officer shot him once with a taser device. The City, through the Shaker Heights Police Department ("SHPD"), did not have a clear policy on taser use, failed to train its officers as to when the use of tasers was appropriate, and ratified the unconstitutional use of the devices through an ongoing failure to clarify its policy in the face of its officers' taser abuse.

2. Tasering has profound impacts on the human mind and body. A taser delivers an electric charge to a person's muscles, overriding the victim's nervous system and paralyzing the muscles. The victim experiences "excruciating pain" throughout his body. *Cockrell v. City of Cincinnati*, 468 Fed.Appx. 491, 492 (6th Cir. 2012).

3. Mr. Maddox brings this civil rights action pursuant to 42 U.S.C. § 1983, to vindicate rights protected by the Fourth Amendment to the United States Constitution. He also brings claims for violations of Article One, Section Fourteen of the Ohio Constitution and for negligent infliction of emotional distress.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Mr. Maddox's claims for violations of his federal constitutional rights, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (jurisdiction over federal constitutional claims). This Court has supplemental jurisdiction over Mr. Maddox's state law claims pursuant to 28 U.S.C. § 1367(a), because these claims arise out of the same set of facts as the federal claims such that all claims form part of the same case or controversy.

5. Venue lies in this district pursuant to 28 U.S.C. § 1391(e), because a substantial part of the events giving rise to the claim occurred here.

## PARTIES

### The Plaintiff

6. Plaintiff Myron Maddox is a 24-year-old Ohio Department of Health State Tested Nurse Aid and a resident of Cleveland, Ohio.

2

**The Defendants**

7. Defendant City of Shaker Heights is a municipal entity. Upon information and belief, the City is responsible for establishing policy, procedures, and training methods for the SHPD.

8. Defendant Officer William Martin is an officer of the SHPD. He is sued in his individual capacity.

9. Defendants at all relevant times and as to all relevant actions described herein were acting under the color of state law.

**FACTUAL ALLEGATIONS**

10. When Mr. Maddox was 17 years old, he was hit by a car and suffered a close head injury, and broke his right arm, right leg, and right foot. As a result of these injuries, Mr. Maddox was in a medically-induced coma for a month and spent a total of four months in the hospital. He had surgery to drain the blood from his head and had several operations to put a metal plate in his arm and a metal rod in his leg. Mr. Maddox underwent a month of physical and occupational therapy. As a result of his injuries, Mr. Maddox is very protective of his head because he fears further injury.

Child Custody Discussion with Arielle Sharp

11. On the morning of December 18, 2010, Mr. Maddox visited Arielle Sharp ("Ms. Sharp"), with whom Mr. Maddox had two children at the time.

12. Mr. Maddox and Ms. Sharp had lived together and had been involved in a romantic relationship. The couple had separated the day before, December 17, 2010, and Ms. Sharp had moved out of their home.

13. Mr. Maddox and Ms. Sharp met at Ms. Sharp's residence on the morning of December 18 to discuss their relationship, separation, and their two children.

3

14. After some discussion with Ms. Sharp at her residence, Mr. Maddox wanted to leave. Ms. Sharp offered to drive him home in her Nissan Sentra.

15. While driving him home, Ms. Sharp and Mr. Maddox continued to discuss their relationship. Ms. Sharp became agitated. Concerned that Ms. Sharp's emotional state would affect her control of the car, Mr. Maddox asked her to pull over and calm down. Ms. Sharp did pull over, but the couple continued to argue.

16. Both parties exited the vehicle and walked around the block as they argued. At this point, Mr. Maddox and Ms. Sharp were standing near the intersection of Onaway Road and Ludlow Road in Shaker Heights, Ohio.

17. As Mr. Maddox and Ms. Sharp walked back toward Ms. Sharp's car, Officer Martin arrived at the scene. Officer Martin had a video camera mounted in his police cruiser and a microphone attached to his person. While the majority of the interaction between Officer Martin and Mr. Maddox occurred away from the camera's view, Officer Martin's microphone recorded the entire interaction.

18. Officer Martin stopped both parties and asked them, "What's goin' on?" and told them to stand in front of his car while he checked to see if either party had any warrants. Mr. Maddox and Ms. Sharp complied with Officer Martin's instructions. When Officer Martin found that neither Mr. Maddox nor Ms. Sharp had any outstanding warrants, he told them, "You guys can go your separate ways if you want to, then."

19. Mr. Maddox and Ms. Sharp then walked together toward Ms. Sharp's car. Mr. Maddox walked toward the car to clarify what his argument with Ms. Sharp meant for their relationship and the custody of their two children.

20. Officer Martin followed them and called to them, "Are you guys going together or separate?"

21. Once Mr. Maddox and Ms. Sharp reached the car, Ms. Sharp sat down in the driver's seat. Mr. Maddox knelt between the driver's door and the driver's seat to speak with Ms. Sharp further about the custody of their children and to retrieve his identification for work from her car.

22. Officer Martin followed the couple, saying, "I thought you guys were going your separate ways?" He then stood approximately three to five feet away from Mr. Maddox beside Ms. Sharp's car.

23. At some point during her conversation with Mr. Maddox, Ms. Sharp moved to close the driver's door. Worried the door might hit his head, Mr. Maddox moved Ms. Sharp's hand away from the door handle.

### The Arrest of Mr. Maddox

24. Officer Martin immediately grabbed Mr. Maddox by the arm, pulled him up from his kneeling position and pushed him toward the rear of Ms. Sharp's vehicle. Officer Martin then pushed Mr. Maddox's head down and pulled his arms behind his back.

25. Officer Martin then told Mr. Maddox, "You're under arrest."

26. Mr. Maddox asked Officer Martin to "get off me, man."

27. When Officer Martin attempted to get Mr. Maddox to bend over the car, Mr. Maddox instinctively pulled his arm in toward his body.

28. At some point during Officer Martin's interaction with Mr. Maddox, Officer Laura Combs ("Officer Combs") arrived at the scene in her police cruiser. Officer Combs exited her vehicle and approached Mr. Maddox and Officer Martin.

5

Officer Combs' cruiser had a mounted video camera. Officer Combs also had a microphone attached to her person, which recorded the audio of Officer Martin's interaction with Mr. Maddox and discussions with other Shaker Heights police officers after the arrest.

29. Officers Martin and Combs pinned Mr. Maddox against the trunk of Ms. Sharp's car, holding both of Mr. Maddox's arms behind him.

30. After Officer Martin told Mr. Maddox that he was under arrest, Officer Martin told Officer Combs, "Get your taser and tase him, will you?" Upon information and belief, Officer Combs never took out or used her taser on Mr. Maddox.

31. Officer Martin again told Mr. Maddox, "You're under arrest." Mr. Maddox conceded, "All right, all right."

32. Despite Mr. Maddox's acquiescence, and after Office Combs' decision not to use her taser, Officer Martin shot Mr. Maddox with the prongs of his department-issued taser.

33. Officer Martin never gave Mr. Maddox any warning that he was going to use the taser.

34. The moment the taser made contact with Mr. Maddox, Mr. Maddox fell to the ground.

35. Mr. Maddox screamed for seven seconds and begged Officer Martin to stop the charge.

36. After the taser had finished its cycle, Mr. Maddox, who was shaking, said to Officer Martin, "I was cool, man." Officer Martin replied, "You smacked her hand." Mr. Maddox responded, explaining, "She was trying to close the door in my face."

6

37. Officer Combs handcuffed Mr. Maddox's wrists behind Mr. Maddox's back while Mr. Maddox was still on the ground.

38. Mr. Maddox had been badly weakened by the taser and was unable to lift himself off of the ground.

39. He tried to explain to Officer Martin that he was very weak, straining to say, "I can't stand up, man." Mr. Maddox later described feeling as though his "body just gave out," adding that being tasered was "like torture."

40. When Mr. Maddox was unable to raise himself off the ground, Officer Martin attempted to force Mr. Maddox to stand by abruptly pulling him up by his sweatshirt hood.

41. After watching Officer Martin try to force Mr. Maddox to stand, Ms. Sharp came over to Mr. Maddox and attempted to help him stand up.

42. At no point did Mr. Maddox make any verbal threats of force or try to harm Officer Martin, Officer Combs, or Ms. Sharp.

43. Mr. Maddox was unarmed during the incident.

44. At no point did Mr. Maddox make an attempt to flee the scene.

Events at the Scene After the Arrest

45. Officer Martin removed the prongs of the taser while at the scene.

46. Mr. Maddox had holes in his abdomen where the taser prongs were removed.

47. Upon information and belief, four or five other Shaker Heights Police officers arrived at the scene.

48. Upon information and belief, Patrolman Martin Dunn transported Mr. Maddox to the Shaker Heights City Jail on charges of domestic violence and resisting arrest in violation of Shaker Heights Municipal Code §§ 725.09 and 737.14.

49. Ater Mr. Maddox was taken away, the other officers discussed the arrest with Officer Martin. Officer Martin told his colleagues of the tasering, "I frickin' pulled back and tased him." One officer replied, "Oh you got him?" to which Officer Martin replied, "It looked like it was working like a charm – it looked like he was having a seizure."

50. Officer Martin then took Ms. Sharp to his vehicle to fill out an incident report. Ms. Sharp told Officer Martin that Mr. Maddox had never been violent with her before and laughed at the suggestion that Mr. Maddox had hurt her when he moved her hand away from the door handle.

### Events at the Shaker Heights City Jail

51. While in the Shaker Heights City Jail after being tasered, Mr. Maddox reported to a guard that his heart was racing and he felt shaky, dizzy, and disoriented — symptoms of an anxiety attack.

52. Mr. Maddox, a trained medical professional, repeatedly asked the guard on duty for medical attention over the course of an hour and a half, but the guard refused to help him.

53. It was only after Mr. Maddox continued to demand medical attention that an ambulance was called. The paramedics took his temperature and pulse, and listened to his heart.

54. The city nurse was then called, and she gave Mr. Maddox Benadryl to calm him down and make him drowsy. Despite Mr. Maddox's belief that he required

8

more substantial medical attention, he decided to cooperate and take the medication. Mr. Maddox was insulted by the dismissive treatment of his condition.

55. Mr. Maddox remained in the Shaker Heights City Jail over the weekend.

56. Mr. Maddox now suffers from what he considers to be claustrophobia, anxiety, and fear of police officers. He has trouble sitting still, feels restless all the time, and can't relax.

57. Mr. Maddox sought psychological counseling after this event.

58. Ms. Sharp did not press any charges for domestic violence.

59. The City of Shaker Heights later dropped all charges against Mr. Maddox.

## SHPD Taser Use and Policy

60. Tasers are also known as Controlled Energy Devices ("CEDs") or Electronic Control Weapons ("ECWs").

61. These weapons are used by many law enforcement agencies in the United States.

62. A taser uses compressed nitrogen to propel a pair of aluminum darts tipped with stainless steel barbs toward the target and upon striking a person, delivers a low ampere electrical charge through the wires and probes and into the target's muscles. Tasering paralyzes the victim and causes "excruciating pain." *Cockrell*, 468 Fed.Appx. at 492.

63. A study performed by the U.S. Department of Justice Office of Community Oriented Policing Services and the Police Executive Research Forum recommends that police give a verbal warning to a suspect before deploying a CED, only use CEDs against suspects who "are exhibiting active aggression or who are

actively resisting in a manner that, in the officer's judgment, is likely to result in injuries to themselves or other," that "ECWs should not be used against a passive subject," and that the mere act of fleeing cannot be the sole justification for the use of a CED.[1]

64. The official policy from Taser International, the manufacturer of the tasers the SHPD uses, recommends officers should "give warning and reasonably perceive [the] subject capable of complying with demands" before deploying a taser. (Exhibit A, p. 15.) However, the SHPD's policy is silent on either of those steps.

65. The SHPD's Action-Response Use of Force Continuum, attached here as Exhibit B, indicates officers may use "electrical devices" when the suspect is "wrestling with" or "pushing" the officer. The phrases "wrestling with" and "pushing" are not defined anywhere in the SHPD use of force policy, leaving each individual officer to define the abstract terms for him or herself. The City, through the SHPD, failed to establish clear boundaries for acceptable taser use.

66. Upon information and belief, Police Chief D. Scott Lee adopted the policy, and was authorized to do so.

67. The SHPD's Response to Threats policy, attached here as Exhibit C, requires all officers trained in the use of tasers to carry those weapons while on duty. (Exhibit C, p. 4) However, SHPD does not provide any guidance as to the use of tasers on people other than that the use of force should be "reasonable." (*Id.* at p. 3)

---

[1] U.S. Department of Justice Office of Community Oriented Policing Services and the Police Executive Research Forum, *2011 Electronic Control Weapon Guidelines*, 20 (March 2011), *available at* http://www.policeforum.org/library/use-of-force/ECWguidelines2011.pdf.

10

68. Incident reports obtained through an open records request from the SHPD describe how officers with the SHPD used tasers in response to suspects demonstrating passive resistance close in time to the tasering of Mr. Maddox. These repeated incidents demonstrate Mr. Maddox's experience was not an isolated incident but is instead part of a pattern and practice of the use of tasers in non-threatening situations.

69. For example, the incident report for case number 09-9662, attached here as Exhibit D, describes how, in 2009, Officer Martin tasered a suspect four times. The suspect was unarmed and made no verbal threats to officers or anyone else at the scene. Officer Martin cited the suspect's movement of his arms toward his body with his fists clenched as the behavior necessitating the use of the taser.

70. In incident number 10-14400, attached here as Exhibit E, officers tasered a female minor after she refused to give her name to the police. The girl and her friends were trespassing after-hours on a school playground. When the girl refused to give her name, and attempted to twist her arm away from the officer's control, an SHPD officer tasered her.

71. The use of the taser in these situations, where the suspects were not actively resisting authority, had made no threats to the officers or other persons, and were not actively fleeing, is a violation of the Fourth Amendment to the U.S. Constitution, and Article One, Section 14 of the Ohio State Constitution.

72. No officer was ever disciplined for the use of a taser in the above-described situations or for any other instances of taser use between 2006 and 2012.

73. The City also failed to discipline Officer Martin in response to the incident involving Mr. Maddox.

74. Despite instances of abuse and the City's knowledge of such practices, nothing has been done to correct them.

75. Proper training is necessary to avoid constitutional violations. Because of the lack of proper training, SHPD officers have repeatedly violated citizens' constitutional rights by using taser devices in numerous situations where such force was not warranted.

76. The City's failure to properly train and supervise its officers amounted to deliberate indifference to the rights of Mr. Maddox and others.

77. The City's deliberate indifference was the underlying cause of the violation of Mr. Maddox's constitutionally protected rights.

78. The unlawful use of tasers without proper training or supervision was so widespread that the City had actual or constructive knowledge of it, but did nothing to end the practice.

79. Mr. Maddox has suffered damages as a direct and proximate result of the City's acts and omissions.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE FOURTH AMENDMENT TO
## THE UNITED STATES CONSTITUTION
### (Excessive Force)

### Against Officer Martin

80. Mr. Maddox repeats and realleges the preceding paragraphs as if fully set forth herein.

81. Officer Martin misused the authority granted to him under color of state law and unjustifiably used his taser against Mr. Maddox.

82. Officer Martin violated Mr. Maddox's right to be free from unreasonable

seizure of his person, as guaranteed by the Fourth Amendment to the United States Constitution.

83. The use of the taser on Mr. Maddox was unreasonable and in violation of Mr. Maddox's Fourth Amendment rights because:

  a) The severity of the crime at issue was not great enough to justify the use of the taser against Mr. Maddox;

  b) Mr. Maddox did not pose an immediate threat to either Officer Martin, Officer Combs, or Ms. Sharp; and

  c) Mr. Maddox never threatened or attempted to harm the officers, nor did he make any attempt to flee the scene.

84. Mr. Maddox suffered damages as a direct and proximate result of these violations.

## Against the City

85. Mr. Maddox repeats and realleges the preceding paragraphs as if fully set forth herein.

86. The City is liable under § 1983 because the City's policy led to the violation of Mr. Maddox's Fourth Amendment rights. The policy was adopted by persons who are authorized to create official policy.

87. The City, through the SHPD, also failed to properly train or supervise its officers in taser use with respect to the Action-Response Use of Force Continuum. The City is liable for failing to provide adequate training to its officers because the City was deliberately indifferent to the constitutional rights of its citizens. It disregarded the known or obvious consequence that its failure to train officers in the appropriate use of tasers would lead to unnecessary and unlawful violence in violation of citizens' constitutional rights.

88. Given the SHPD officers' repeated improper use of tasers, the City had constructive notice of a pattern and practice of unconstitutional activity before Officer Martin tasered Mr. Maddox. By failing to discipline officers for their improper use of tasers, the City unofficially approved the conduct. The City is liable for its custom of excessive force that is so well settled as to constitute usage with the force of law. The City's deliberate indifference was the direct cause of Mr. Maddox's harm.

89. The City's failure to discipline its officers amounted to ratification of the officers' unconstitutional behavior.

90. The City is, upon information and belief, the final policymaker.

91. Mr. Maddox has suffered damages as a direct and proximate result of Defendant City's acts and omissions.

## SECOND CAUSE OF ACTION
## VIOLATION OF ARTICLE ONE, SECTION 14
## OF THE OHIO STATE CONSTITUTION
### (Excessive Force)

92. Mr. Maddox repeats and realleges the preceding paragraphs as if fully set forth herein.

93. Officer Martin's and the City's acts and omissions—the same set of facts that set forth violations of the Fourth Amendment—constitute violations of Article One, Section Fourteen of the Ohio Constitution.

94. Mr. Maddox has suffered damages as a direct and proximate result of Officer Martin's and the City's acts and omissions.

## THIRD CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

95. Mr. Maddox repeats and realleges the preceding paragraphs as if fully set forth herein.

96. Through his actions, Officer Martin engaged in conduct so extreme and outrageous as to extend beyond the bounds of decency and is intolerable in a civilized community.

97. Officer Martin should have known that his acts and omissions would cause Mr. Maddox to suffer serious emotional distress.

98. As a direct result of the Officer Martin's acts and omissions, Mr. Maddox suffered serious emotional distress.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

## **PRAYER FOR RELIEF**

Plaintiff requests judgment against the Defendants as follows:

a. Compensatory and consequential damages in an amount to be determined at trial;

b. Punitive damages on all claims allowed by law, in an amount to be determined at trial;

c. Injunctive relief;

d. Attorney fees and costs associated with this action; and

e. Any further relief as this Court deems just and proper and any other relief as allowed by law.

Dated:  December 12, 2012  CASE WESTERN RESERVE
        Cleveland, Ohio  UNIVERSITY SCHOOL OF LAW
                                       MILTON A. KRAMER LAW CLINIC CENTER
                                       11075 East Boulevard
                                       Cleveland, Ohio 44106
                                       (216) 368-2766

                                       By: s/Avidan Y. Cover_____
                                           Avidan Y. Cover (0087534)
                                           Emily Grannis (Local R. 83.6)
                                           Jenna Leventoff (Local R. 83.6)

                                       *Attorneys and Legal Interns for Plaintiff*